IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| DUSTIN R. RUDDELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 1:15-cv-01331 (LMB/JFA) |
| | ) |
| TRIPLE CANOPY, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Plaintiff Dustin R. Ruddell ("plaintiff" or "Ruddell") has filed this civil action under the

Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., against defendant Triple

Canopy, Inc. ("defendant" or "Triple Canopy"), a defense contractor that provides security

services to various government agencies, including the Department of State (DOS), for

employment discrimination and failure to reasonably accommodate plaintiff's disability. First

Am. Compl. (Compl.), [Dkt. 5] ¶ 3; Written Stip. of Uncontested Facts (Stip.), [Dkt. 60] ¶ 4.

Although the complaint included a claim under the "Louisiana Employment Discrimination

Act," Compl. ¶ 3, plaintiff has abandoned that claim.

Discovery has been completed and the parties have filed and argued their cross-motions

for summary judgment, which are the subject of this memorandum opinion. For the reasons that

follow, defendant's motion will be granted and plaintiff's motion will be denied.

## I.     BACKGROUND

The majority of facts in this record are not disputed. Before joining Triple Canopy,

plaintiff served two tours of duty in the Navy. Stip. ¶ 3. During that period, Lt. Commander

Jessica Plichta Wilson diagnosed plaintiff with Attention Deficit Hyperactive Disorder (ADHD).

Ruddell Dep., [Dkt. 70-7] at 19:9–21. To manage that disorder, Ruddell was prescribed

Adderall XR. Ruddell Dep., [Dkt. 79-1] at 13–30. Adderall XR is an amphetamine, meaning it

is a central nervous system stimulant. Ruddell Dep., [Dkt. 70-7] at 140:5–8; "Amphetamine,"

Dorland's Illustrated Medical Dictionary (26 ed., John P. Friel ed., 1981). Without Adderall,

Ruddell becomes "moody," experiences "depression," and his mind is "all over the place."

Ruddell Dep., [Dkt. 74-1] at 97:21. From November 30, 2012, until June 22, 2015, Ruddell was

under the care of Diane Davis, a nurse practitioner. Stip. ¶ 18. During those years, Nurse Davis

reauthorized Ruddell's Adderall prescription several times. Ruddell Dep., [Dkt. 79-1] at 13–30.

     Triple Canopy is a prime contractor on the Worldwide Protective Services (WPS)

Contract for DOS. Stip. ¶¶ 1, 4. One portion of the WPS Contract is Task Order 5 (TO-5),

under which Triple Canopy provides security services in Baghdad, Iraq. Stip. ¶¶ 1, 4. Plaintiff

was deployed on this contract in April 2011 as an explosive detection dog (EDD) handler. Stip.

¶¶ 6–7. "As an EDD Handler on TO-5, many of Plaintiff's missions were on 'ambassador's

detail,' providing mobile security. As part of this detail, Plaintiff served on an advance team and

(using a trained bomb-sniffing dog) cleared the area of explosives if a diplomat or an ambassador

had a meeting to ensure the safety of the dignitary." Stip. ¶ 8. While deployed, Ruddell had to

carry a firearm at all times. Stip. ¶ 10. The job also "required him to: (1) provide emergency

response in . . . life threatening situations; (2) summon professional assistance and render first

responder first aid . . . ; (3) explosive ordnance detection; (4) prevent the unauthorized

introduction of explosive devices or matter; and (5) protect life and property." Stip. ¶ 11.

Defendant concedes that "Ruddell's performance was 'steadily consistently good.'" Def. Opp.

to Pl. Mot. for S.J. (Def. Opp.), [Dkt. 75] at 3.

The WPS Contract contains two primary provisions on contractor use of prescription

medication. [Dkt. 70-11] at 3. Section 7.17 provides:

> Contractor personnel who is [sic] taking prescription medication, except for the
> short-term antibiotics, anti-malarial prophylaxis, or oral contraceptives, which are
> not already a matter of record with the Contractor, shall notify his or her
> supervisor and submit a medical certificate or other administratively acceptable
> documentation of the prescription and its effect(s) to the Regional Security
> Officer and DS/OPO/HTP.
>
> The Regional Security Officer with the assistance of DS/OPO/HTP shall
> determine whether such Contractor personnel shall be allowed to continue to
> carry a firearm while taking the medication. Pending written approval, Contractor
> personnel shall not perform [personal security] duties.

[Dkt. 70-11] at 3. In Section 8.06(2), the contract provides:

> Typically, prescription medication will be approved for use under the treatment of
> a qualified attending Physician in accordance with approved dosages and when
> the medication does not cause drowsiness or otherwise impair performance and
> are [sic] part of the employee's official medical record.

[Dkt. 70-11] at 6.

The WPS Contract also contains two relevant provisions described as "General

Necessary Conditions," which provide more information about the terms and conditions of

defendant's responsibilities. The first is Section C.4.1.1, which reads:

> The Contractor shall ensure that all work performed under this contract is
> accomplished in accordance with the applicable standards, standard operating
> procedures, general orders, and specific orders issued by [DOS] unless otherwise
> directed by the [Contracting Officer], [Contracting Officer
> Representative/General Technical Manager], [Regional Security Officer], [Agent
> in Charge], or the Program Office. Any changes in standards, standard operating
> procedures, or General Orders for any particular PRS or guard detail will be
> identified in the applicable Task Order.

[Dkt. 70-11] at 2. Section C.4.1.2 reads in relevant part:

> The Contractor, including all Contractor personnel accomplishing work under this
> contract, shall accomplish all work under this contract in compliance with the
> direction provided by the Department of State [Contracting Officer], [Contracting

Officer Representative/General Technical Manager], [Regional Security Officer], Agent in Charge (AIC) or the Program Office.

[Dkt. 70-11] at 2. The WPS Contract itself is silent about what happens if a contractor violates either of these two sections, but defendant's corporate representative Jeffrey Johnson testified in his deposition that failure to adhere to requirements in letters from the Contracting Officer Representative (COR) would lead the government to "terminate the contracts and . . . put it [sic] up for rebid." [Dkt. 70-12] at 26:17–18. There is no evidence in the record contradicting that statement.

In 2013, DOS and Triple Canopy began to correspond about the medication provisions of the WPS Contract. The first letter, which came from DOS on February 15, 2013, and was addressed not only to defendant but to "All Worldwide Protective Services (WPS) Contractors providing support in Iraq," discussed contractors' obligation to conduct drug testing under the WPS Contract. [Dkt. 70-13.] DOS specifically observed that "[i]t is the responsibility of each WPS Contractor to remain compliant with Section 8.05 (Drug Screening) of the WPS base contract by ensuring 100% of personnel serving on the task order are screened within every 6 month time period." [Dkt. 70-13] at 1. DOS then provided a list of actions that each contractor should take to facilitate that process, including providing information to employees, sending a supervisor to accompany employees being tested, reporting "non-negative" test results, and removing "non-negative" employees from billable status and "[U.S. government]-provided housing" while follow-up takes place. [Dkt. 70-13] at 1–2.

Defendant replied on February 22, 2013, asking for clarification on several issues related to the prescription medication policy, among them whether "it [was] the intention of DOS that anyone prescribed prescription drugs while on task order by [Comprehensive Health Services

4

(CHS)] shall be removed from the project and returned to home of record[.]"[1] [Dkt. 70-14] at 2. Triple Canopy then requested that DOS "publish a list of medications that would prohibit a Triple Canopy employee from performing on this contract while using one or more of those proscribed medications, along with a statement regarding why each medication . . . serves as a disqualifying factor based upon the specific job requirements[.]" [Dkt. 70-14] at 2.  In its February 22 letter, Triple Canopy also informed DOS that it had "significant concerns that employees who are negatively impacted by the review process may invoke the legal protections of the ADA." [Dkt. 70-14] at 3.

In a reply sent March 8, 2013, DOS declined to provide the requested list of medications, stating that "[DOS] is also bound by the terms of the Americans with Disabilities Act and the Uniformed Services Employment and Reemployment Rights Act, and we feel that existing department guidelines allow us to comply with these regulations." [Dkt. 70-17] at 4.[2]  After receiving that letter, defendant sent an email dated April 9, 2013, to all employees working on the DOS contract advising that "DOS has expanded the testing to the following list of drugs," and providing an itemized list of medications including "amphetamine." [Dkt. 70-19.]

On June 6, 2013, DOS followed up with another letter.  This time, DOS provided a list of medications that it considers "inconsistent with working in a high threat environment." [Dkt. 70-18 at 1.] That list included "amphetamine and derivatives," and DOS directed contractors to ensure that "no one is operating in a billable capacity on the task order while taking . . . any of the above substances." [Dkt. 70-18] at 1.  The June 6 letter also provided different instructions

---

[1] CHS is a separate contractor that provides medical support services to other DOS contractors on the WPS Contract.  COR Letter Dated 2/22/2013, [Dkt. 70-14] at 1.

[2] As discussed in Part II.B, the DOS statement that it is bound by the ADA is in error; the Rehabilitation Act, not the ADA, applies to disability-based discrimination claims against the federal government.  See 29 U.S.C. § 701 et seq.; 42 U.S.C. § 12101 et seq.

with respect to psychotropic and psychotherapeutic medications generally, concluding that they "<u>may</u> be inconsistent with work in a high threat environment," directing disclosure to DOS for further evaluation, and explaining that "[i]f an individual is taking medications containing the substances listed above, the Contractor shall remove that individual from duty either temporarily until the condition requiring the use of the medication is resolved, or permanently." [Dkt. 70-18] at 2 (emphasis added).

On June 2, 2014, almost exactly one year after receiving the itemized list from DOS, Triple Canopy sent a letter to all its WPS Contract employees identifying "prohibited medications" including "amphetamine and derivatives," specifically listing Adderall as an example of an "amphetamine." [Dkt. 70-20.]

It is not clear when Triple Canopy first became aware that Ruddell was using Adderall. Although Ruddell asserted in his deposition that he "wrote down on the paper that [he] was taking Adderall" throughout his employment, [Dkt. 70-7] at 70:1–2, he also testified that he would stop taking the medication before his drug screening tests because he thought he had to "to make a living." [Dkt. 70-7] at 69:19–22. Ruddell also asserted that he was rebuffed when he attempted to inform CHS about taking Adderall. [Dkt. 70-7] at 133:20–134:1. Defendant's corporate designee Jeffrey Johnson conceded in his deposition that Triple Canopy "was notified" that Ruddell was on Adderall a year and half before his termination, but emphasized that because Ruddell never tested positive, no action was taken to remove him from the contract. [Dkt. 74-4] at 37:14–38:21.

On June 6, 2014, Triple Canopy supervisor Marcus Neville asked Ruddell if he was "still taking" Adderall. Ruddell Dep., [Dkt. 70-7] at 155:4–6; Def. Memo. 11. Ruddell replied that he was. Ruddell Dep., [Dkt. 70-7] at 155:4–6; Def. Memo. 11. According to plaintiff, he was told

the same day that he had to come off the WPS Contract and fly home at his own expense. [Dkt. 70-7] at 157:3–22.  Ruddell considered that directive to be equivalent to "termination" because once he was "taken off the contract," he was no longer drawing a paycheck.  [Dkt. 74-1] at 161:8–9.  As a result, he "immediately started another job that provided [him] with health insurance."  [Dkt. 74-1] at 160:12–14.

It is uncontested that defendant did not technically terminate plaintiff until May 8, 2015, and that it continued to make healthcare benefits available to him until December 31, 2014. Burnett Dec., [Dkt. 70-2] ¶¶ 14–16.[3]  Triple Canopy asserts that plaintiff's termination from the company (as opposed to the WPS Contract) was a routine result of plaintiff being inactive (that is, not on a contract) for 120 days, and not because he was on Adderall.  Burnett Dec., [Dkt. 70-2] ¶ 14.

After his removal from the WPS Contract, Ruddell consulted with his healthcare provider and then emailed Triple Canopy to say that the provider had "released" him to work "as long as [he] continue[d] [his] prescribed use of Adderall XR 30 mg."  [Dkt. 70-23.]  Triple Canopy replied that it could not allow him to serve on the WPS Contract as long as he was taking Adderall.  [Dkt. 70-23.]  In that reply, Triple Canopy invited Ruddell to look for alternate postings available on its website.  [Dkt. 70-23] ("[Y]ou are welcomed [sic] to search TC's non DOS programs for other positions.  Please advise me of your intentions.").  Ruddell searched the database but could not find any position for which he was qualified.  See Ruddell Dep., [Dkt. 70-7] at 181:15, 227:14–15.  Defendant agrees that no such position existed when it removed Ruddell from the WPS Contract.  Wallace Dec., [Dkt. 70-2] ¶ 11.  According to Ruddell's

---

[3] Plaintiff apparently did not realize that these benefits were still available.  See Ruddell Dep., [Dkt. 74-1] at 160:12–14.

deposition testimony, he spoke with Academi, a corporate sibling of Triple Canopy, about a K9 position there. [Dkt. 77-5] at 43:17–19. Both Triple Canopy and Academi are subsidiaries of Constellis Group, Inc. Ruddell Dep., [Dkt. 77-5] at 43:18. Ruddell did not obtain the Academi position because his security clearance had expired. Ruddell Dep., [Dkt. 77-5] at 45:14–17.

## II.    DISCUSSION

### A. Summary Judgment Standard of Review

Summary judgment is warranted where "there is no genuine dispute as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When the parties file cross-motions for summary judgment, the court "must consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Krpan v. Registry of Interpreters for the Deaf, Inc., No. 1:15-cv-458, 2016 WL 889662, at *4 (E.D. Va. Mar. 8, 2016) (internal citations and quotation marks omitted). For each motion, the Court will "resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." Id. (internal citations and quotation marks omitted).

Nevertheless, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient" to defeat summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). For a dispute to be "genuine," then, there must be "evidence such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. Likewise, to amount to a "material" dispute, the issue must potentially "affect the outcome of the suit under the governing law." Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001).

If the nonmovant bears the burden of proof, the moving party may nevertheless prevail by demonstrating "that there is an absence of evidence to support the nonmoving party's case."

8

Celotex Corp. v. Catrett, 477 U.S. 317, 322–25 (1986).  To survive summary judgment, the nonmoving party must raise "specific facts" rather than mere "metaphysical doubts" to refute the movant's position.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (internal quotation marks omitted).  If the nonmoving party fails to raise facts to support an "essential element" of its claim, the moving party is entitled to judgment as a matter of law. Rhodes v. E.I. du Pont de Nemours & Co., 636 F.3d 88, 94 (4th Cir. 2011).

   B. Disability Discrimination Statutes

   Because defendant has raised the issue of derivative sovereign immunity, it is necessary to discuss the statutes that prohibit disability discrimination both in the private sector and by the federal government.  The ADA prohibits large private employers from engaging in disability discrimination.  See 42 U.S.C. § 12101 et seq.  The Rehabilitation Act prohibits the federal government, and other federally-funded programs and entities, from doing so.  See 29 U.S.C. § 701 et seq.  Section 501 of the Rehabilitation Act addresses discrimination in federal hiring, and § 504 addresses employment discrimination more generally.  29 U.S.C. §§ 791, 794.  Under both the ADA and the Rehabilitation Act, the plaintiff bears the burden of showing that he is the victim of an adverse employment action as a result of disability discrimination, or that the employer failed to reasonably accommodate his disability.  See Raytheon Co. v. Hernandez, 540 U.S. 44, 49 n.3 (2003); Johnson v. Shalala, 991 F.2d 126, 131 (4th Cir. 1993).

   C. Analysis

   **1. Derivative Sovereign Immunity**

   Defendant claims that as a federal government contractor it is entitled to derivative sovereign immunity.  Def. Memo. 16.  Plaintiff responds that defendant is not immune from liability under the ADA because it exceeded its authority under the contract and it has waived

any sovereign immunity by holding itself out as bound by the ADA.  Pl. Opp. to Def. Mot. for

S.J. (Pl. Opp.) 16–17.

      The Supreme Court has recognized that federal government contractors share the United

States' immunity when they act pursuant to authority "validly conferred" by the United States

government.  Campbell-Ewald Co. v. Gomez, 136 S. Ct. 663, 673 (2016) (citing Yearsley v.

W.A. Ross Constr. Co., 309 U.S. 18, 21 (1940)).  Immunity is available when "the government

has directed a contractor to do the very thing that is the subject of the claim."  Corr. Servs. Corp.

v. Malesko, 534 U.S. 61, 74 n.6 (2001).  Therefore, the contractor is entitled to claim immunity

"only if it adhered to the terms of its contract with the government."  In re KBR, Inc., Burn Pit

Litigation, 744 F.3d 326 (4th Cir. 2014).  To determine whether a contractor has acted in

conformity with the contract, a court may look to the contract's "appended task orders, and any

laws and regulations that the contract incorporates."  Id.

      Derivative sovereign immunity exists because the government and its contractors have

"the same interest in getting the Government's work done."  See Boyle v. United Technologies

Corp., 487 U.S. 500, 506 (1988).  For that reason, "the scope of immunity is defined by the

nature of the function being performed and not by the office or the position of the particular

employee involved."  Mangold v. Analytic Servs., Inc., 77 F.3d 1442, 1447 (4th Cir. 1996)

(emphasis in original).  When acting under valid governmental authority, therefore, a contractor

is immunized "to the same extent as the Government" would be if it stood in the contractor's

shoes.  See Federico v. Lincoln Military Housing, LLC, 127 F. Supp. 3d 623, 637 (E.D. Va.

2015).  Put simply, a contractor cannot claim a derivative immunity that exceeds the immunity of

the sovereign.

It is this last principle that ultimately defeats Triple Canopy's claim to derivative immunity because Congress has prohibited the federal sovereign from discriminating on the basis of disability through the Rehabilitation Act, just as it has prohibited private sector employers from doing so through the ADA. See 29 U.S.C. § 701 et seq.; 42 U.S.C. § 12101 et seq. Defendant nevertheless argues that immunity attaches because plaintiff has brought this civil action under the ADA and the federal government has not waived its sovereign immunity from suit brought specifically under the ADA. In other words, defendant argues that because a disabled federal employee could only sue the government for disability-based discrimination by invoking the Rehabilitation Act, which is a different cause of action than the ADA, federal government contractors are immune from suit under the ADA too.

As defendant candidly acknowledged at oral argument, accepting its view of immunity would create a regime in which federal contractors acting on government instructions would be the only large employers in the country that could discriminate on the basis of disability with impunity. That result would disregard Congress' efforts to harmonize the substantive standards applicable under the ADA and the Rehabilitation Act. Although "the ADA and Rehabilitation Act are not exactly the same in all respects," Baird v. Rose, 192 F.3d 462, 469 (4th Cir. 1999),[4] Congress has directed that "[t]he standards used to determine whether [§§ 501 and 504 of the Rehabilitation Act have] been violated . . . shall be the standards applied under title I of the Americans with Disabilities Act[.]" 29 U.S.C. §§ 791(f), 794(d).   Courts considering the

---

[4] Most notably, plaintiffs suing under § 504 of the Rehabilitation Act, alleging employment discrimination against the federal government, must show a more stringent causal nexus than ADA plaintiffs. See Baird, 192 F.3d at 469. The Fourth Circuit has not ruled on whether the more stringent causation standard applies to claims under § 501 of the Rehabilitation Act. See Dank v. Shinseki, 374 Fed. App'x 396, 399 (4th Cir. 2010) ("The question of whether the 'solely by reason of' standard applies to section 501 claims is far from settled.").

relationship between the two statutes "construe the ADA to grant at least as much protection as provided by the regulations implementing the Rehabilitation Act," Bragdon v. Abbott, 524 U.S. 624, 632 (1998) (citing 42 U.S.C. § 12201(a)). "Moreover, Congress has called for a coordinated interpretation of the Rehabilitation Act and the ADA to 'prevent [] imposition of inconsistent or conflicting standards for the same requirements' under the two standards[.]" Rogers v. Dep't of Health & Env. Control, 174 F.3d 431, 433 (4th Cir. 1999) (quoting 42 U.S.C. § 12117(b)) (alteration in original).

Defendant's claim of being immune from suit under the ADA is also inconsistent with its pre-litigation communications with DOS, which reveal that Triple Canopy did not believe it was immune from the requirements of the ADA. Defendant raised "significant concerns that employees who are negatively impacted by the [drug screening] review process may invoke the legal protections of the ADA" in its letter to the COR dated February 22, 2013. [Dkt. 70-14] at 3. Moreover, in the WPS Contract, DOS affirmed that it is "fully committed to the prevention and elimination of discriminatory and sexual harassment within the workforce. Discriminatory harassment includes any conduct targeting an individual's . . . disability[.]" [Dkt. 70-11] at 7.

Defendant relies on Circuit City Stores, Inc. v. Equal Employment Opportunity Comm'n, 75 F. Supp. 2d 491 (E.D. Va. 1999), to argue that the government has not waived its sovereign immunity under the ADA; however, the procedural posture of that case distinguishes it from the present one. Circuit City does not address the question of derivative sovereign immunity at all, much less whether derivative immunity is available where, as in the disability discrimination context, the government is held to a legal standard that is "substantially the same" as a private employer. See Doe v. Univ. of Md. Med. Sys. Corp., 50 F.3d 1261, 1264 n.9 (4th Cir. 1995). Instead, it addresses whether an employer could use the ADA to sue the federal government

directly. In that case, the EEOC opened an investigation into one of Circuit City's contractual practices, and Circuit City sought to obtain a declaratory judgment that the practice in question was lawful. Id. at 496. Because Circuit City needed a cause of action against the government, it cited a potpourri of federal statutes, including the ADA, in an effort to invoke the court's jurisdiction. Id. at 503–04. In concluding that none of the proffered statutes conferred subject matter jurisdiction, the court held that none of those statutes waived sovereign immunity "for the type of action here presented." Id. at 504. That is, neither the ADA nor the other statutes conferred on Circuit City a direct cause of action against the United States. By contrast, Ruddell does not seek to proceed against the United States. He properly brings this civil action against his private employer. As such, it must be brought under the ADA and not the Rehabilitation Act, which applies to claims against the federal government.

Recognizing the potential breadth of the claimed exception, defendant sought to qualify the implication of its argument. Citing Butters v. Vance Int'l, Inc., defendant argued that contractors would only be immune when performing acts that are "quintessentially . . . 'peculiar to sovereigns.'" 225 F.3d 462, 465 (4th Cir. 2000) (quoting Saudi Arabia v. Nelson, 507 U.S. 349, 361 (1992)). In Butters, the court confronted a contractor's immunity claim derived from the Foreign Sovereign Immunities Act (FSIA), not immunity derived from the United States' common law sovereign immunity. Under the FSIA, whether an activity is "peculiar to sovereigns" is of great consequence, because foreign states can be sued for "commercial" activities that are not uniquely sovereign. See Butters, 225 F.3d at 465 (citing 28 U.S.C. § 1605(a)(2)). That distinction is irrelevant to the sovereign immunity of the United States, which applies without regard to the nature of the government's activity. See F.D.I.C. v. Meyer, 510 U.S. 471, 475 (1994). Consequently, the language defendant quotes from Butters

provides no legal basis for cabining the context in which a contractor could claim immunity from the provisions of the ADA. Given Congress' clear intent to protect workers, whether in the private or public sectors, from discrimination based on disability and the lack of relevant case law supporting the immunity claim, defendant's argument that it is immune from suit as to plaintiff's discrimination claim fails.

Even if defendant were immune from plaintiff's discrimination claim, it would not be immune from his failure to accommodate claim because no communication from DOS instructed defendant to refuse to search for a new post for Ruddell. In fact, the March 8 DOS letter stated that "[DOS] consider[s] whatever steps Triple Canopy takes internally (e.g., placing the individual on administrative leave, temporary reassignment to an unarmed CLIN, flying them out of country, etc.) to mitigate and/or comply with Triple Canopy policies are purely an internal business decision on the part of Triple Canopy." [Dkt. 70-17] at 3. Given that clear statement from DOS, defendant was not acting pursuant to specific DOS instructions when it communicated with Ruddell about reassignment and cannot claim derivative sovereign immunity for that decision. For these reasons, defendant's argument that it is immune from liability under the ADA fails.

### 2. Discrimination Claim

On the merits of the ADA discrimination claim, defendant primarily argues that plaintiff is not a "qualified individual" protected by the statute. Def. Memo. 20. Plaintiff responds that the amphetamine ban is not a job related requirement and that his demonstrated ability to perform the job while taking Adderall proves he is qualified. Pl. Memo. in Support of S.J., [Dkt. 74] at 12.

To prevail on a claim of discrimination under the ADA, a plaintiff must first make out a prima facie case, which requires establishing that: (1) he is disabled; (2) he is a qualified individual for the employment at issue; and (3) the employer took an adverse employment action because of his disability.  Equal Employment Opportunity Comm'n v. Stowe-Pharr Mills, Inc., 216 F.3d 373, 377 (4th Cir. 2000).

To be considered a qualified individual, a plaintiff must show that he satisfies the "job-related requirements of the employment position," 29 C.F.R. § 1630.2(m), and can "perform the essential functions of the employment position," either "with or without reasonable accommodation," 42 U.S.C. § 12111(8).  Although the ADA generally prohibits the use of "qualification standards" that screen individuals based on a disability, such a standard is nevertheless lawful if the employer can show that it is "job-related for the position in question and is consistent with business necessity."  42 U.S.C. § 12112(b)(6).

Triple Canopy presents two main arguments to support its position that plaintiff is not a qualified individual.  First, it argues that being amphetamine-free is a "job-related requirement" that Ruddell failed to satisfy.  Def. Memo. 20.  Second, it argues that the amphetamine ban is a "qualification standard" that is "job-related" and "consistent with business necessity."  Def. Memo. 24–27.

There is little distinction between the standards used to assess a "job-related requirement" versus a "qualification standard" that is "job-related" and "consistent with business necessity." See Tate v. Farmland Indus., 268 F.3d 989, 993 (10th Cir. 2001) (defining a "job-related requirement" to be a "specification" that is "job-related, uniformly enforced, and consistent with business necessity").  When an employer institutes such a requirement or qualification out of concern for the safety of the employee, his colleagues, or the public, a court will be reluctant to

"second guess" the "legitimate business judgment" of the employer. Id. at 994; see also Cochran v. Holder, No. 1:06-cv-1328, 2010 WL 447013, at *8 (E.D. Va. Feb. 1, 2010), aff'd on other grounds 436 Fed. App'x 227 (4th Cir. 2011). This is particularly true where the safety standard in question has been formulated by the government in light of risks posed by the work environment. See Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 570–73 (1999); Tate, 268 F.3d at 994.

Viewed in this light, the amphetamine ban is a "job-related" standard that is justified in light of "business necessity." The parties agree that an EDD handler must "carry a firearm . . . 100% of the time." Stip. ¶ 10, and must be ready, at any time, to "(1) provide emergency response in . . . life threatening situations; (2) summon professional assistance and render first responder first aid . . . ; (3) [detect] explosive ordnance . . . ; (4) prevent the unauthorized introduction of explosive devices or matter; and (5) protect life and property." Stip. ¶ 11. Plaintiff conceded in his deposition that without his medication, he "can't do the job to the best of [his] ability." [Dkt. 70-7] at 98:15–16. Moreover, plaintiff admits that if he were unable to obtain, or forgot to take, his medication, he would be "taking a chance on [his] mind wandering off or . . . symptoms oncoming, and [he would be in] a potentially dangerous situation and . . . have other people's live in [his] hands and vice versa." [Dkt. 70-7] at 98:16–20. Plaintiff also admitted it is possible (albeit unlikely) that he could be "stranded" for "more than a day" while performing his job. [Dkt. 70-7] at 83:17. Considering the extreme hazards facing EDD handlers in Baghdad, this Court will not "second guess" DOS' considered judgment that someone who requires amphetamines to focus is unqualified to serve in the position, a judgment which Triple Canopy had to implement under the terms of the DOS contract. The need to safeguard the EDD

handlers, as well as the people they protect, permits DOS to determine that any risk in this context is too great.

Plaintiff urges the Court to distinguish this case from the principles articulated in <u>Tate</u> and <u>Cochran</u> on two bases: that the amphetamine ban is contractual, rather than statutory or regulatory, and that Ruddell had in fact performed the job for several years without problems while taking Adderall.  Pl. Opp. 23.  For these propositions, plaintiff relies on <u>Hoehn v. Int'l Sec. Servs. & Investigations, Inc.</u>, 120 F. Supp. 2d 257 (W.D.N.Y. 2000), in which the Western District of New York held that a private security firm could not claim that a binocular vision requirement was job-related merely because it was part of the firm's contract with the federal government.  <u>Id.</u> at 266.  Plaintiff's reliance on that case is misplaced.  The defendant's problem in <u>Hoehn</u> was not that the vision requirement was contractual, but that the defendant had not shown that the qualification was "job-related and consistent with business necessity."  <u>Id.</u> at 265.  Plaintiff's past performance of his job was a piece of evidence suggesting that the requirement was not "job-related and consistent with business necessity."  <u>See id.</u>  In particular, the <u>Hoehn</u> court was not persuaded that the qualification adopted in that case was "based on considerations of the general public's safety."  <u>Id.</u>

No such doubt exists in this case.  The June 6 COR letter that explicitly banned amphetamine use cited the inconsistency of relying on such medication with working in a "high threat environment."  [Dkt. 70-18] at 1.  Plaintiff's own admissions establish the risky nature of an EDD handler's job.  That Ruddell had not yet encountered a problem is not material to the <u>ex ante</u> question facing Triple Canopy and DOS—whether someone taking Ruddell's medication would be able to confront a threat arising at any point in the future.  On that issue, no triable question of fact remains.  Whether it is framed as a "job-related requirement" or a "qualification

standard," the amphetamine ban is "job-related" and "consistent with business necessity." Enforcement of the ban in this specific, very dangerous work environment therefore does not violate the ADA, or for that matter the Rehabilitation Act, as a matter of law.

The parties have also sparred over whether the plaintiff is disabled, whether he could perform the essential functions of the job with accommodation, and whether the adverse employment action was a result of his disability. Because the failure of a plaintiff to meet any one element of the required prima facie case entitles a defendant to summary judgment, the Court need not address those arguments, see Rhodes, 636 F.3d at 94, and summary judgment will be granted to the defendant on this claim.

### 3. Failure to Accommodate Claim

The parties initially dispute what "reasonable accommodation" the plaintiff may raise at summary judgment. Defendant contends that plaintiff is bound by his answer in both his deposition and interrogatory responses that the only basis for his reasonable accommodation claim is Triple Canopy's failure to search its system for a vacant position on his behalf. Def. Memo. 18. Plaintiff argues that "his correspondence with the Defendant . . . made it clear that what he wanted was to return to work while continuing to take his prescription medication." Pl. Rep. 8.

Ordinarily, a party is bound by the responses he gives to discovery inquiries. See Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806–07 (1999). Courts rightly view efforts to introduce new theories of liability for the first time at summary judgment with skepticism. See id. In its interrogatory, Triple Canopy asked Ruddell to "[s]tate each and every fact supporting [his] contention that Defendant 'made no attempt to reasonably accommodate'" him. [Dkt. 70-25] at 2. Plaintiff's reply makes no reference at all to his request that he be allowed to

continue working while taking Adderall. See [Dkt. 70-25] at 2. Instead, his one-paragraph response focuses exclusively on Triple Canopy's failure to search for a new position that Ruddell might fill. [Dkt. 70-25] at 2. Confronted with this interrogatory response at his deposition, plaintiff was asked, "As you sit here today, are there any additional facts that you wish to identify concerning your contention that Triple Canopy made no attempt to reasonably accommodate you or assign you to other posts?" [Dkt. 70-7] at 227:19–228:1. Plaintiff's reply was simply: "No." [Dkt. 70-7] at 228:2.

At summary judgment, plaintiff presses a second reasonable accommodation: permitting Ruddell to continue working on the WPS Contract while taking Adderall. Pl. Rep. 8. Although this accommodation goes beyond the answers that the plaintiff gave in his deposition and his interrogatory response, it does not go beyond the pre-deposition record. Plaintiff's email to Triple Canopy representative Burnett on July 18, 2014, is a request to be permitted to return to work on the WPS Contract while still taking Adderall. [Dkt. 70-23.] This is not an instance where the plaintiff seeks to create a genuine issue of fact by introducing a post-deposition affidavit or similarly late-filed document. See Policy Mgmt. Sys. Corp., 526 U.S. at 806. Consequently, the Court will consider the claim for reasonable accommodation as it relates to both the request to continue on the WPS Contract while taking Adderall and to have defendant search for a new position for the plaintiff.

To prevail on his reasonable accommodation claim, plaintiff must show that: (1) he was disabled; (2) the employer knew of that disability; (3) if reasonably accommodated, the plaintiff could perform the essential functions of the job; and (4) the employer declined to make such an accommodation. Wilson v. Dollar Gen. Corp., 717 F.3d 337, 345 (4th Cir. 2013). Once an employee has reported a disability, the employer is under an obligation to engage in an

"interactive process" to determine whether reasonable accommodation is possible. Because that process must be truly "interactive," an employer is not required to continue the process when "the employee cannot identify a reasonable accommodation that would have been possible." Id. at 347; see also Bell v. Shinseki, 584 Fed. App'x 42, 43 (4th Cir. 2014) (summary judgment proper because plaintiff "has not produced evidence that there were any positions available at the time of her termination that she was qualified to fill"). Moreover, when one party stops responding to the other, the court should be alert for "'signs of failure to participate in good faith.'" Crabill v. Charlotte Mecklenburg Bd. of Educ., 423 Fed. App'x 314, 323 (4th Cir. 2011) (quoting Beck v. Univ. of Wisc. Bd. of Regents, 75 F.3d 1130, 1135–36 (7th Cir. 1996)). Because plaintiff, no less than defendant, has an obligation to engage in the interactive process in good faith, "an employer cannot be faulted if after conferring with the employee to find possible accommodations, the employee then fails to supply information that the employer needs or does not answer the employer's request for more detailed proposals." Taylor v. Phoenixville School Dist., 184 F.3d 296, 317 (3d Cir. 1999).

Defendant argues that plaintiff's request to permit him to continue on the WPS Contract while taking Adderall was impossible. Def. Opp. 17. On the request that Triple Canopy search its database for a new position, Triple Canopy argues that Ruddell founders on three bases: the requested accommodation is unrelated to his disability, Ruddell did not engage in the interactive process in good faith, and Ruddell has failed to identify any available position that he was qualified to fill. Def. Memo. 28–29.

Plaintiff has failed to produce any evidence that Triple Canopy could have permitted Ruddell to work on the WPS Contract while taking Adderall. At oral argument, Plaintiff contended that the DOS instruction mandated a case-by-case determination, rather than outright

banning everyone taking medications containing amphetamines. Although the June 6 DOS letter does provide for individualized decisionmaking with respect to some substances (such as medications that induce certain side effects), [Dkt. 70-18] at 2, its directive for those taking any of the enumerated medications (including amphetamines) is clear: "it is incumbent on each WPS Contractor to manage their personnel in a way that ensures no one is operating in a billable capacity on the task order while taking (or under the influence of) any of the above substances, their derivatives, and/or commercial/brand labeled medication which contains any of these substances." [Dkt. 70-18] at 1. Plaintiff then claims that the COR letters were non-binding guidance, but there is no evidence in the record to support that contention.[5] In fact, the WPS Contract explicitly incorporates by reference any "special orders" from DOS officials. [Dkt. 70-11] at 2. Uncontradicted deposition testimony from Triple Canopy's corporate representative states that defendant would lose the contract with DOS if it failed to comply with the amphetamine ban. [Dkt. 70-12] at 26:17–18. Because the accommodation plaintiff requests would result in the elimination of the position, it is not a "possible" accommodation under the ADA, and is therefore not "reasonable."

Turning to plaintiff's demand that defendant search its database for available positions, defendant first argues that, because Ruddell's disability did not prevent him from searching defendant's website, the requested act was not an "accommodation" of his disability. Def. Memo. 29. This argument views the situation through an artificially narrow lens. Although Ruddell does not allege that he would have trouble physically conducting the Internet search,

---

[5] Under Fed. R. Civ. P. 56(c), "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record. . . [or] showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

according to him the reason the search needed to be conducted by defendant was because of Triple Canopy's response to his disability.  It is therefore wrong to say that searching for a new position would not have been an "accommodation" of plaintiff's disability.

Even so, plaintiff had an obligation to participate in the interactive process in good faith and identify an available position in which he was interested.  The record demonstrates that he did neither.  When Burnett, a Triple Canopy human resources representative, informed plaintiff that he could not continue on the WPS Contract, Burnett concluded the email by advising Ruddell that he was "welcomed [sic] to search TC's non DoS programs for other positions." [Dkt. 70-23.]  Burnett specifically asked Ruddell to "[p]lease advise [Burnett] of [Ruddell's] intentions." [Dkt. 70-23.]  Plaintiff admits he never replied to that email.  Ruddell Dep., [Dkt. 70-7] at 181:7–8.  Instead, the record shows that he immediately forwarded the email to his lawyer, who replied "That's great that's what we wanted to hear.  Will prepare response on Monday." [Dkt. 70-24] at 1.  Plaintiff's failure to respond to Burnett demonstrates that he was not engaged in the interactive process in good faith.  That conclusion alone would entitle Triple Canopy to judgment as a matter of law on the failure to accommodate claim.

Even if plaintiff had engaged in good faith to find a new position with defendant, he has failed to identify an available Triple Canopy post that he was qualified to fill.  At his deposition, he was asked, "[A]s you sit here today, you can't identify any positions that were available at that moment in time for which you were eligible, right?" [Dkt. 70-7] at 181:12–14.  He replied, "That's correct." [Dkt. 70-7] at 181:15.  And there is no evidence in this record of Triple Canopy having any open positions for which plaintiff was qualified.  Elsewhere in his deposition, Ruddell claims he spoke with Academi, which shares a parent corporation with Triple Canopy, about one of Academi's K9 positions. [Dkt. 77-5] at 43:17–44:1.  That

conversation does not satisfy plaintiff's burden for two reasons.  First, plaintiff's testimony demonstrates that he did not hold the security clearance required to fill that post.  [Dkt. 77-5] at 43:19–45:17.  Plaintiff was therefore not "qualified" to hold that position.  Second, neither Academi nor Constellis, the parent corporation, are named defendants in this case.  Accordingly, even if plaintiff had been qualified for a position with Academi, he has not satisfied his burden of proving that Triple Canopy failed to reasonably accommodate him.

In sum, because plaintiff's evidence fails to show that the accommodations he requested were reasonable, and fails to establish that he engaged in the interactive process in good faith, defendant is entitled to judgment as a matter of law on the failure to accommodate claim.

### III.      CONCLUSION

For the reasons discussed above, defendant's Motion for Summary Judgment will be granted and plaintiff's Motion for Summary Judgment will be denied by an appropriate order to be issued with this Memorandum Opinion.

Entered this 29 day of August, 2016.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge